FANNIE C. WILLIAMS, by next friend, *vs.* ELEANOR N. CORSON and others.

April Term, 1875.

LIFE POLICY—MAY BE DISPOSED OF BY WILL.— A husband and father who has taken out a policy of insurance on his own life, payable to him, his executors, administrators, and assigns, may dispose of the same by will.

SAME—STATUTES EXEMPTING PROCEEDS FROM DEBTS.—The provisions of the Code, §§ 2294 and 2478, directing that any insurance effected by a husband on his own life shall enure to the benefit of his widow and children, free from the claims of his creditors, only apply when the policy remains undisposed of by the husband in his life-time.

*Shakleford* and *Bryan*, for complainants.

*R. McP. Smith*, for defendants.

THE CHANCELLOR:—H. O. Williams died in the year 1871, having first made a valid nuncupative will, by which he bequeathed his personalty, and especially the surplus proceeds of a policy of insurance on his own life, to his widow, the defendant Eleanor N., now the wife of defendant H. C. Corson. This policy was made payable, on his death, to his executors, administrators, and assigns. Being in debt, the decedent had, in his life-time, transferred a part of this policy to secure his creditors, leaving a residue of the sum assured of about $2,400. This amount the widow has collected, and claims under the nuncupative will. The complainant is an only child of the decedent by a former wife, and has filed this bill by next friend, claiming a share of the funds received from the policy, under the Code, §§ 2294 and 2478. It is agreed that the demurrer of the defendants to the bill raises the question whether the

proceeds of such a policy can be bequeathed by will, or must pass under the statute, and argument has been made accordingly.

Section 2294 of the Code reads thus: "A life insurance effected by a husband on his own life shall enure to the benefit of the widow and next of kin, to be distributed as personal property, free from the claims of creditors."

Section 2478 is: "Any life insurance effected by a husband on his own life shall, in case of his death, enure to the benefit of his widow and children; and the money thence arising shall be divided between them according to the law of distributions, without being in any manner subject to the debts of the husband, whether by attachment, execution, or otherwise."

Both of these sections are taken from the act of 1846, ch. 216, § 3, which was construed by the supreme court of this state, in *Rison* v. *Wilkinson*, 3 Sneed, 565. The language of that act was: "That any husband may effect a life insurance on his own life, and the same shall in all cases enure to the benefit of his widow and heirs, in the present rates of distribution, without being in any manner subject to the debts of said husband, whether by attachment, execution, or otherwise." The act is a little stronger in its phraseology than the Code, in using the words, "in all cases," in connection with the operative clause, "shall in all cases enure to the benefit" of the widow and heirs. But, in substance, the provisions are the same.

The statement of the case, as made by the learned judge who delivers the opinion in *Rison* v. *Wilkinson*, shows that the policy in that case was, like the policy in this case, in the ordinary form, taken out by the husband, and by him assigned, with the assent of the company, as collateral security for a debt of the husband. It is manifestly an inadvertence on the part of the reporter when he says, in the preliminary statement of facts, that the insurance was effected by way of indemnity to the husband's creditors. The bill was filed by the widow and children against the

creditors, claiming the whole amount of the insurance, under the act of 1846, precisely upon one of the grounds assumed in argument in this case—that the statute was plain and positive that the policy should in all cases enure to the benefit of the widow and children, and should not be subject, in any manner, to the claims of creditors. The contest was between the widow and children on the one side, parties expressly preferred by the act, and creditors on the other, parties expressly excluded by the act. It was, therefore, a stronger case than the one before the court, where the contest is between the widow and child, both of the preferred class.

" It is contended," say the court, " that this act operates as a settlement upon the widow and children of the insured, and cannot be diverted from their use and benefit by any act of his or his creditors." " Its phraseology," they add, " is very strong and forcible in favor of the rights of the widow in exclusion of the creditors. But it must have given to it a sensible construction. &ast; &ast; &ast; Surely it was not intended to divest the insured, while he lived, of the right of disposing of his own as he pleased, so as to bind those who might come after him, and stand in his shoes. &ast; &ast; &ast; We think that nothing more is intended by the act, and that no other operation can be given to it, than to prevent a fund of this kind from passing into the hands of the administrator, with the other effects of the insured, in favor of the widow and children; or, in other words, to prefer them to creditors to that extent. But it can only apply where the claim remains undisposed of by the deceased. His power over it during life is not at all affected by the act, but continues as ample and unrestricted as before."

Language could not possibly be stronger or plainer. The act was not intended to prevent a husband who takes out a policy on his life in the ordinary form from dealing with it as with any other property he may acquire. It will only apply where the claim remains undisposed of by the deceased

during his life. It is obvious that a disposition by will is as efficacious to dispose of a man's property as a disposition by assignment or deed. If his power during life is not affected by the act, but continues as ample as before, the power to bequeath by will remains as effective as the power to transfer by assignment.

Undoubtedly it is within the competency of the legislature to limit the power of disposition of property by will for the benefit of the widow and children of the testator, or other persons. The civil law, as it exists in France and in Louisiana, does, for the benefit of the children, limit the power of the parent to give his property by will to third persons to a definite portion of the estate. And the testamentary power, it would seem, has been limited in this state in regard to property exempt by law from execution, at any rate, where the estate is insolvent and the contest is between the widow and children and creditors. *Pride* v. *Watson*, 7 Heisk. 232. If the estate be solvent, and the contest is with a legatee of the exempted articles, the question might be different, and certainly other principles controlling the rights of the parties would come into play. The legislation under consideration in this case has not, either in express terms or by fair implication, gone so far. It does not control the power of disposition at all, and only provides for the benefit of the widow and children to the exclusion of creditors where the parent and father has not made in his life-time a valid disposition of his property. The power of disposition is one of those incidents of ownership which lies at the basis of modern civilization, and can, it seems to me, only be curtailed by the clearest expression of legislative intent.

But, it is urged, the assured cannot dispose of the policy by will, for the reason that the will does not speak until the death of the testator, and in such event the statute steps in and makes the distribution, and hence the will must be held for naught. The answer is that, by the decision in *Rison* v. *Wilkinson*, the power of disposition during life is

not affected by the act, and that this power may be effectually exercised, even if the gift or grant, whether it be by deed or will, do not become practically operative until after death. It is the execution in life that gives validity to a will or deed, and the time when the donee goes into possession, or reaps the actual benefit, is a mere incident.

Nevertheless, the very point thus made by the learned counsel was elaborately argued and considered three centuries ago, in one of the celebrated causes of that day—a cause rendered still more memorable by the fact that it is supposed to have been the occasion of one of the colloquies of the Shakspearean drama. Plowden's reports were popular when first published, having been four times reprinted during the last quarter of the sixteenth century. They have been commended by our ablest American commentator for their authenticity and accuracy, and as " exceedingly interesting and instructive by the evidence they afford of the extensive learning, sound doctrine, and logical skill of the ancient English bar." Better authority, therefore, we could not find. In *Hales* v. *Petit*, 1 Plow. 253, Sir James Hales, one of the justices of the common pleas, a son of an eminent baron of the exchequer, was found by a coroner's jury to have wilfully gone into a river " and himself therein feloniously and voluntarily drowned." Such an act was, in those days, if not " rank burglary," at least felony without benefit of clergy, and not only deprived the guilty party of christian burial, but occasioned a forfeiture of his goods and chattels to the crown. The suit was between an assignee claiming under the crown, and the widow of the deceased, and raised the question whether a joint lease to Justice Hales and wife was forfeited to the crown, or survived to the widow. The argument turned upon the nice point whether the felony of the husband was consummate in his life-time, or only after his death.

Two able sergeants sought, on behalf of the widow, to satisfy the court that the felony was consummated after the death of the distinguished judge. The following is a

18

specimen of the " sound doctrine and logical skill" of these members of the ancient English bar. They insisted that the " forfeiture shall only have relation to the time of the death, and the death precedes the forfeiture, for until the death is fully consummate he is not a *felo de se;* for if he had killed another, he should not have been a felon until the other had been dead. And for the same reason he cannot be a *felo de se* until the death of himself be fully had and consummate. For the death precedes the felony both in the one case and in the other, and the death precedes the forfeiture. But, nevertheless, the forfeiture comes at the same instant that he dies ; yet in things of an instant there is priority of time in consideration of law, and the one shall be said to precede the other, although both shall be said to happen at one instant; for every instant contains the end of one time, and the commencement of the other. And, accordingly, here the death and the forfeiture shall come together and at one same time, yet there is a priority ; that is, the end of the life makes the commencement of the forfeiture, though, at the same time, the forfeiture is so near to the death that there is no meantime between them, yet, notwithstanding that, in consideration of law, the one precedes the other, but by no means has the forfeiture relation to any time in his life."

It required four learned sergeants, on behalf of the assignee of the crown, to meet this lucid argument. They insisted that the forfeiture should have relation to the act done in the life-time which was the cause of the death. And one of them said : " The act consists of three parts. The first is the imagination, which is a reflection or meditation of the mind, whether or no it is convenient for him to destroy himself, and what way it can be done. The second is the resolution, which is a determination of the mind to destroy himself, and to do it in this or that particular way. The third is the perfection, which is the execution of what the mind has resolved to do. And this perfection consists of two parts, viz., the beginning and the end. The begin-

ning is the doing of the act which causes the death, and the end is the death, which is only a sequel to the act." And much more to the same purport.

The reasoning of the court is in the same learned and discriminating vein. For the Lord Dyer said : " That five things are to be considered in this case. First, the quality of the offence ; secondly, to whom the offence is committed ; thirdly, what shall be forfeit ; fourthly, from what time the forfeiture shall commence ; and, fifthly, if the term here shall be taken from the wife." And Sir Anthony Brown, J., said : " Sir James Hales was dead, and how came he to his death? It may be answered, by drowning. And who drowned him? Sir James Hales. And when did he drown him? In his life-time. So that Sir James Hales, being alive, caused Sir James Hales to die, and the act of the living man was the death of the dead man."

The decision was in favor of the assignee of the crown, and upon the ground that the act of the living man was the effective cause of the felony, although the latter was only consummate upon the death. It is an authority directly in point on the question before us, and binding as a precedent, whatever may be said of the peculiar form in which its logic is presented.

The Elizabethan drama is full of legal allusions, showing that the business of the courts was brought home to the people in those days even more than in our era. What wonder, then, that the great dramatist, in his marvellous range of vision, should see this specimen of legal acumen, and serve it up for the amusement of the groundlings, and as a foil to the tragic end of the gentle Ophelia.

In Sir James Hales' case the coroner sat on him and found it felony. In Ophelia's case the " crowner " sat on her and found it christian burial. In the first case, the learned counsel says that the act consists of three parts : the imagination, the resolution, and the perfection. " If I drown myself willingly," says the clown, " it argues an act ; and an act hath three branches : it is to act, to do, and to

perform." The learned court discusses its case upon the supposition that the man went to the water. The clown concedes that, " if the man go to the water and drown himself, it is will he nill he, he goes. But," he adds, " if the water come to him, he drowns not himself. Argal, he that is not guilty of his own death, shortens not his own life." " But is this law? " queries his fellow-clown. " Aye, marry, is't; crowner's quest law."

NOTE.—This decision was affirmed on appeal.